|   |   |   |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | UNITED STATES DISTRICT COURT | |
| 8 | WESTERN DISTRICT OF WASHINGTON AT SEATTLE | |
| 9 | | |

```
COASTAL TRANSPORTATION,           CASE NO. C17-1555JLR
INC.,
                                  ORDER DENYING MOTION
                   Plaintiff,     FOR SUMMARY JUDGMENT
        v.

EAST WEST SEAFOODS L.L.C.,

                   Defendant.
```

## I.  INTRODUCTION

Before the court is Defendant East West Seafoods, L.L.C.'s ("EWS") motion for summary judgment. (MSJ (Dkt. # 34).) Plaintiff Coastal Transportation, Inc. ("Coastal") opposes the motion. (Resp. (Dkt. # 38).) The court has considered the motion, the

//
//
//

ORDER - 1

parties' submissions in support of and in opposition to the motion, relevant portions of the record, and the applicable law. Being fully advised,[1] the court DENIES the motion.

## II. BACKGROUND

This is a maritime action in which Coastal alleges that EWS failed to pay for certain freight services. (*See* Compl. (Dkt. # 1) ¶¶ 2.1, 3.1-5.4.) Coastal is a maritime transportation and logistics company that ships cargo for various customers, including EWS. (Compl. ¶ 3.1; Answer (Dkt. # 6) ¶ 3.1.) Coastal shipped cargo for EWS on various dates during 2017. (Compl. ¶ 3.2; Answer ¶ 3.2 (admitting that Coastal was the carrier for EWS, as a consignee, on six invoices from February 17, 2017, to May 19, 2017).) The dispute between the parties centers on two shipments of bait—one from Seattle Washington to Dutch Harbor, Alaska, and a second from Dutch Harbor to Adak, Alaska. (*See generally* MSJ; Resp.)

In support of its motion, EWS submits two declarations: (1) the declaration of Chris Tsabouris, who is a principal of EWS (Tsabouris Decl. (Dkt. # 35) ¶ 1), and (2) the declaration of Todd Hoppe, who is a principal of Hoppe Fisheries, LLC ("Hoppe") (Hoppe Decl. (Dkt. # 36) ¶ 1). Mr. Hoppe testifies that on February 17, 2017, he spoke with Jerome.P. Amo, the Sales & Managing Director of Coastal, to arrange the shipment of two containers of bait from Seattle, Washington, to Dutch Harbor, Alaska. (*See id.* ¶ 2; *see also* Amo Decl. (Dkt. # 39) ¶ 1 (identifying Mr. Amo's position at Coastal).) Mr.

//

---

[1] Neither party requests oral argument (*see* MSJ at 1; Resp. at 1), and the court does not consider oral argument helpful to its disposition of this motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

Hoppe attests that, although he has never seen a bill of lading for the shipments, he paid for the shipments with a wire transfer of $10,000.00 and directed delivery of the bait to F/V Pacific Producer, which is EWS's seafood processing vessel. (*Id.*; *see also* Tsabouris Decl. ¶ 3 (confirming that the F/V Pacific Producer is EWS's seafood processing vessel).)

Mr. Tsabouris confirms that EWS agreed to store Mr. Hoppe's bait aboard the F/V Pacific Producer in Dutch Harbor. (Tsabouris Decl. ¶ 2.) He attests that Mr. Hoppe "was the party that had two containers of bait shipped from Seattle to Dutch Harbor" and that EWS "has no use for bait and does not purchase bait." (*Id.* ¶ 3.)

Mr. Hoppe attests that on April 7, 2017, he negotiated again with Mr. Amo of Coastal to ship more bait—this time from Dutch Harbor to Adak, Alaska. (Hoppe Decl. ¶ 3.) Mr. Hoppe attests that Mr. Amo offered to reduce the price of shipment from $30,000.00 to $15,000.00 if EWS agreed to allow Coastal to load more than 400,000 pounds of boxed frozen cod from the F/V Pacific Producer onto another vessel known as the Coastal Progress, following delivery of the bait. (*See id.*) Mr. Hoppe testifies that, "[p]ursuant to said agreement," he "arranged for $15,000.00 to be wire transferred to Coastal," and "Coastal subsequently shipped more than 400,000 pounds of frozen cod loaded from the [EWS's F/V Pacific Producer] onto the [Coastal Progress] out of Adak." (*Id.*)

Mr. Hoppe further attests that "other than serving as the drop off point and storage facility, [EWS] had nothing to do with the transaction." (*Id.* ¶ 4.) He states that EWS's "only involvement was as a delivery point." (*Id.*) He also attests he "paid Coastal the

entire amount due for the shipping," and "[t]here was never an agreement for any other amount." (*Id.*)

In opposition to EWS's motion for summary judgment, Coastal submits two declarations: (1) the declaration of Mr. Amo (Amo Decl. (Dkt. # 39) ¶ 1), and (2) the declaration of Titshing Yip, who is the controller of Coastal (Yip Decl. (Dkt. # 40) ¶ 1). In these declarations, Coastal relates a different course of events concerning the same transactions.

Mr. Amo testifies that Mr. Tsabouris came into Coastal's Seattle office in early 2017, and asked him about freight rates for frozen bait from Seattle to Dutch Harbor. (Amo Decl. ¶ 3.) Mr. Amo attests that Mr. Tsabouris represented that EWS would be the customer. (*Id.*) Mr. Amo explains that, although Coastal had done business with EWS in the past, EWS did not have a credit relationship with Coastal and, therefore, EWS was a "cash customer." (*Id.*) Mr. Amo testifies that because the two bait shipments were interstate, the parties must have a written contract to vary the freight charges from the tariff. (*Id.*; *see also* Yip Decl. ¶ 3 ("Unless there is a contract rate negotiated, the rates charged for the cargo are determined by Coastal's existing tariff. The effective tariff at the time was STB CSIW-010AY [RE-ISS 12-23-2016].").) Mr. Amo attests that there was no written contract between the parties, and Coastal did not provide any price break on these shipments. (Amo Delc. ¶ 3.) According to Mr. Amo, Coastal shipped the two loads of bait to Dutch Harbor. (*Id.*)

Mr. Amo also testifies that, in accordance with Coastal's accounting department's standard policy for cash customers, Coastal required Mr. Tsabouris to provide (1) a 50%

advance payment based on the estimated amount of the invoice prior to shipping, and (2) a credit card number on file for any overage. (*Id.* ¶ 4.) Mr. Yip also testifies that because EWS does not have a credit account with Coastal, Coastal's policy is to require a minimum payment of 50% of the estimated freight charges prior to sailing and a credit card on file with authorization to charge the remainder. (Yip Decl. ¶ 4.) Mr. Yip attests that, on February 17, 2017, he processed a $10,000.00 advance payment from Mr. Hoppe to Coastal for the northbound shipment of bait. (*See id.* ¶¶ 5, 8.) He also testifies that, per Coastal's policy, EWS provided a credit card on file to cover any unpaid freight charges. (*Id.*) Mr. Amo testifies that Mr. Tsabouris shipped more than just the frozen bait and, as a result, the final invoice was higher than the estimated amount. (Amo Decl. ¶ 4.) Mr. Amo attests that the balance of the invoice was not paid as agreed, and so in late March 2017, Coastal's accounting department charged Mr. Tsabouris's credit card that was on file. (*Id.*; *see also* Yip Decl. ¶ 4.)

Contrary to Mr. Hoppe's testimony, Mr. Amo expressly denies that Mr. Hoppe spoke with him to arrange the shipment of bait from Seattle to Dutch Harbor for $10,000.00. (*Compare id.* ¶ 5, *with* Hoppe Decl. ¶ 2.) Mr. Amo notes that Mr. Hoppe does not appear in any of Coastal's paperwork concerning the transaction, but EWS is listed as the consignee. (Amo Decl. ¶ 5.)

Mr. Amo also expressly denies that Mr. Hoppe called him in late March or early April 2017. (*Compare id.* ¶ 7, *with* Hoppe Decl. ¶ 3.) Mr. Amo attests instead that Mr. Tsabouris called him asking to arrange another bait delivery from Dutch Harbor to Adak, Alaska. (Amo Decl. ¶ 7.) According to Mr. Amo, the tariff rate on the bait shipment was

$41,037.28. (*Id.*) However, Mr. Tsabouris stated that he had a group of fishermen delivering cod to the F/V Pacific Producer, in Adak, and asked for a discount if he promised EWS would ship the processed cod on Coastal vessels from Adak. (*Id.*) Because this shipment was between ports in Alaska, the tariff rates could be varied without a written contract, and Mr. Yip testifies that the rates were adjusted in this instance. (Yip Decl. ¶ 8.) Mr. Amo attests that in response to Mr. Tsabouris's suggestion, he "verbally offered [a] $30,000[.00] all-in rate for the bait only and required a $15,000[.00] advance payment with the balance to be paid prior to delivery in Adak." (Amo Decl. ¶ 7; Yip Decl. ¶ 8 ("The handshake agreement that was made was that if Coastal delivered the bait at a lower rate, EWS would ship its frozen product from Adak on Coastal vessels.").) Mr. Amo attests that Mr. Hoppe was not involved in the freight arrangements or the rate negotiations. (Amo Decl. ¶ 8.) Mr. Yip testifies that he processed a $15,000.00 payment from Mr. Hoppe on the shipment from Dutch Harbor to Adak. (Yip Decl. ¶ 8.)

Mr. Amo testifies that Coastal had a carrier lien on the bait while it was onboard the shipping vessel, and it was Coastal's policy to require full payment before releasing the cargo. (Amo Decl. ¶ 9.) Nevertheless, Mr. Amo attests that Coastal released the bait cargo at Adak based on the verbal promise of Mr. Tsabouris that EWS would use Coastal for the southbound shipment of frozen cod, and Coastal would have a lien on the cod for the unpaid bait charges. (*Id.*) Mr. Amo states that "Mr. Tsabouris did not keep his word" and instead sold the cod to a third-party, who shipped the cod to Asia without Coastal's assistance. (*Id.*)

| | |
|---|---|
| 1 | On October 20, 2017, Coastal filed suit against EWS for failure to pay for its |
| 2 | freight services and account stated. (*See* Compl. (Dkt. # 1).) On May 17, 2019, EWS |
| 3 | filed its motion for summary judgment asserting that Mr. Hoppe was responsible for the |
| 4 | freight services invoices at issue, not EWS, and that the invoices were paid in full. (*See* |
| 5 | MSJ.) Coastal filed an opposition to the motion (*see* Resp.), but EWS did not file a reply |
| 6 | (*see generally* Dkt.). The court now considers EWS's motion. |
| 7 | **III.  ANALYSIS** |
| 8 | **A.  Standard for Summary Judgment** |
| 9 | Summary judgment is appropriate if the evidence, when viewed in the light most |
| 10 | favorable to the non-moving party, demonstrates "that there is no genuine dispute as to |
| 11 | any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. |
| 12 | P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, |
| 13 | 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing |
| 14 | there is no genuine issue of material fact and that he or she is entitled to prevail as a |
| 15 | matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, |
| 16 | then the non-moving party "must make a showing sufficient to establish a genuine |
| 17 | dispute of material fact regarding the existence of the essential elements of his case that |
| 18 | he must prove at trial" to withstand summary judgment. *Galen*, 477 F.3d at 658. The |
| 19 | court is "required to view the facts and draw reasonable inferences in the light most |
| 20 | favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). |
| 21 | // |
| 22 | // |

**B. EWS's Motion**

A cursory review of the evidence in this matter reveals that Coastal has met its burden to show a genuine dispute of material fact regarding the essential elements of its case against EWS. The parties provided declarations from witnesses who relate contradictory versions of the shipping transactions at issue. If one credits the testimony provided by Mr. Hoppe and Mr. Tsabouris, then one would likely conclude that EWS is not liable for the unpaid shipping invoices allegedly owed to Coastal. (*See generally* Hoppe Decl.; Tsabouris Decl.) If one credits the testimony of Mr. Amo and Mr. Yip, one would likely conclude that EWS is responsible for the unpaid shipping invoices allegedly owed to Coastal. (*See generally* Amo Decl.; Yip Decl.) Indeed, Coastal provides competent, declaratory testimony that disputes nearly every material fact stated in the declarations provided by EWS. (*Compare* Hoppe Decl. & Tsabouris Decl., *with* Amo Decl. & Yip Decl.)

At the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). Where, as here, declarations contradict each other, summary judgment is precluded. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (holding that the plaintiff can defeat summary judgment by submitting a declaration contradicting defendant's assertions). Viewing the facts in the light most favorable to Coastal, as the court is required to do, *see Scott*, 550 U.S. at 378, the court concludes that there are material factual issues that must be resolved at trial, and accordingly, denies EWS's motion for summary judgment.

## IV. CONCLUSION

Based on the foregoing analysis, the court DENIES EWS's motion for summary judgment (Dkt. # 34).

Dated this 27th day of June, 2019.

JAMES L. ROBART
United States District Judge